Chief Justice Robertson
delivered the Opinion af the Court.
To an action of covenant, brought by Curie against - ° Steele, on a written warranty of the soundness of a slave, the latter pleaded: first—that the writing was executed in Virginia, and that, having no seal, it was, by the lex loci contractus, not a covenant, but a simple contract merely. Second—that the warranty was made in consideration, altogether, of a sale of the slave by himself to Curie in Virginia; that both of them were then citizens of Kentucky; and that Curie bought the slave with the intention and for the purpose of importing him into this state, in violation of the statute of 1815, interdicting the importation of slaves for merchandise,'
The law of the place where a personal contract is made, determines its interpretation, obligation and effect— unless it appears, npon its face, that it is to be performed elsewhere, and then, in those respects, the law of the place of performance prevail^. As to the remedy, and the effect pf evidence, the law of the court yvhere the remedy is sought, is ¡dope to be consulted,
The meaning of a contract is the same, and except where particular forms are required by law, the moral and legal obligation is the same, whether it be sealed or unsealed, written or verbal; these are characteristics which are most material when the modes pf prpying and enforcing the con tract, are to he considered: the lex fori, therefore, and not the lex loci, in general; determines the selection of the remedy.
*382 The Court having sustained demurrers to both pleas, and verdict and judgment having been thereupon rendered against Steele, for damages—he now complains that the Court erred in each of its judgments on the demurrers to the pleas.
Each plea presents an interesting, and rather novel, point, hitherto unadjudged in this Court, and neither of which has, so far as we know, been perfectly settled by judicial determinations elsewhere. And therefore, not considering ourselves as concluded respecting either of them, by authority, we shall briefly examine both— each in its numerical order—on principle and analogy, and authority also, as far as it exists.
First. It is a general rule-of comity among the more enlightened nations of this age, that the interpretation, obligation, and nature, of personal contracts shall, every where, be governed by the lex loci contractus, vel solutionis-, that is, by the law of the place where the contract was made, or by that of the place where it was, by its terms, to have been performed. The contract in this case, is not, upon its face, within any of the exceptions from that rule; and, therefore, as it does not appear, that the place of performance was different from that of the contract, the law of Virginia should prevail in determining the construction, obligation, and effect, (or nature,) of the agreement.
But it is also a rule of comity, equally general and prevailing, that, as to remedy, and the competency and effect of evidence, the lex fori, or law of the Court where remedy is sought, shall alone be consulted.
The question, then, to be decided, is whether the essence, nature, interpretation or obligation of the contract, was involved in the facts pleaded. It is evident that neither the essence, interpretation, nor obligation of the agreement can be affected by the matter of the plea; for all these (whether the plea be true or false) will be, in effect, the same; whether the warranty be a covenant, or a mere assumpsit, its legal obligation is the same in quality and degree-, its meaning is the same, and every thing essential to its validity, must necessarily be the same—nothing appearing here to the contrary.
The act of 1812, concerning unsealed writings, applies to those not made in this state, as well as to those made here—provided a seal was not essential to the validity—but only to give dignity or effect to the instrument as evidence, in the place where it was made.
The memorial of a - contract to warrant a slave sound, consisted of an unsealed writing executed (since J812,)in Virginia: held, that this writing (tho’ made, and, according to its face, to be per:* formed, in Pa.) comes within the act of 1812, and that covenant fnot assumpsit) is the appropriate action upon it.
As to the nature of the contract, there might be more room for doubt and diversity of opinion. Whether a contract be joint or several; principal or accessorial; absolute or contingent; legal or illegal; personal or real, are all facts pertaining to, or determining, its nature. But whether it be written or unwritten, sealed or unsealed, may generally be deemed a matter of evidence; as to its existence and terms.
A seal not being, as we are bound to presume, essential to the validity, or legal effect, of such a contract as this in Virginia, its essential nature, as a contract, whether sealed or unsealed, must be the same there, and of course, here.
Whether, in Virginia, it be a specialty; or a simple contract, a covenant or an assumpsit, is not material to its import, or obligation, or essential nature; and to whatever class it may belong, or by whatever name it may be called, it is still a valid contract of warranty; and, when established or proved, is as binding and effectual in the one character as the other. A seal might impart to it more conclusiveness, as mere evidence of the agreement of the parties; but wh'ether it shall, as evidence, be entitled to any such factitious dignity in a Court of this state, the law of the forum, and that alone, decides. And the same law, conceding to the contract all the legal obligation to which it would be entitled by the lex loci contractus, determines, also, whether it shall be denominated covenant or assumpsit; and whether the written memorial of it shall be conclusive or inconclusive evidence of its existence and terms, and what remedy may be maintained upon it.
Hence, so far as remedy is concerned, the law of this state may decide whether the memorial of the contract shall be deemed a sealed or only an unsealed writing. This seems to have been the prevailing judicial doctrine, so far as there has been any on this point. Story's Conflict of Laws, 475, sec, 567.
And wo are disposed to understand the statute of 1812 of this state (Slat. Law¿ 343) as intending to abolish, in our own Courts, all common-law distinction between executory agreements in writing which have a seal, and *384 those which have no seal, wheresoever they may have been made, since 1812, and whenever by the law of the place, where made, or to be perforáiéd, a seal was not essential to their validity;, but was material only as to the degree or effect of proof, or as to the mode of suit. Thus far, and no farther, Kentucky had a right to legislate respecting foreign contracts; and 'to the whole extent óf remedy merely, we are of the! opinion, that the eighth section of her statute of 1812 (supra) should be understood as applying to foreign, as well as to domestic contracts.
A contract for doing that which is malum in se ■, or malum prohibitum will not be enforced in a court of justice. No contract can beenforeedifany portion of its object or consideration was a contemplated violation ofpublic pol icy or moral duty.
The theory, that courts will not treat as invalid, contracts made with a view to violate the revenue laws &c. of foreign states, questioned.-No court of any country will enforce any contract—wherever or by whoever made, when the object of the contract was a violation of any law of the country whose court is appealed to.
If a slave were sold in another state, for the purpose of being brought here, in violation of our statute, and the consideration was in any way connected with that purpose; or if the vendor was to aid or assist in the unlawful importation, he could not recover, upon his contract, in any court in this state.
Whereforéj as thé writing in this casé, though executed in Virginia, is dated long since 1812, and as* also, a seal is not shown to have been essential in that state, any more than in this, to the legal validity or obligation of thé warranty, it seems to us most consistent to conclude, that covenant, and not assumpsit, was the pi’oper action, just as it would have been, had the contract been made Aeré, instead of there: and, consequently, we are of the opinion that the Circuit court did not err in sustaining the demurrer to the first plea¿
Second. The other plea presents a still more important, and vexed, as well as vexatious question. It is a general and well established principle of the common law, that a contract,/or the doing of that which is either malum prohibitum or malum in se, will not be enforced by a court of justice. It is also a general rule, that a contract will not be enforced by the power of the law, if ■any portion of its object or consideration was a contemplated violation of public policy or moral duty. And therefore, although it has been said by Valin and Emerigon, and some others—erroneously, as we are inclined, with Polhier, to think—that the Courts of one nation will not regard as invalid or illegal contracts made by citizens of that nation, or within its limits, for violating the revenue or *385 Other economical laws of another nation, yet it is universally admitted, that a Court of the country whose Jaw had been thus violated or jeoparded, would not enforce any stipulation of such an agreement, wheresoever or by whomsoever made. If then Steele sold the slave for the ¡mrpose of violating our statute of 1815, prohibiting the importation of slaves; or if the violation of that statute Was any ingredient of the consideration to him; or if, by the contract of sale, he was to do any thing towards aiding, or in any manner facilitating, the importation of the slave, no Court in this state could compel Curie to pay the price.
Examination ttf the vexed question, whether, when a vendor sells a commodity with a knowledge -that it is designed for an unlawful purpose, but without any intention of participating in such unlawful purpose —he can recover the consideration; and without any definite opinion expressed, as this case does not require it—an intimation that whether he can recover, or not, ought to depend upon the degree of turpitude evinced by the contemplated transgression of the law.
But what effect a mere knowledge, by Steele, of Curie’s •imputed object in buying the slave, would have been entitled to have, as a defence to an action for the price, is a question respecting which there has been much diversity of opinion among enlightened jurists.
The doctrine which first prevailed was, that such knowledge alone would not have |ffected the contract with illegality on Steele’s part; or have been, sufficient-, therefore, to prevent him from recovering the price of the slave by suit.
In Holman vs. Johnson (Cowper R. 341,) Lord Mansfield, with the concurrence of all the other Judges of the Court of King’s Bench, delivered a luminous and elaborate opinion in support of that conclusion; and a similar doctrine was reiterated in Hogson vs. Temple, (5 Taunton R. 183.)
But the converse was afterwards adjudged in the case of Lightfoot vs. Tenant, (1 Bos. & Pull. 351-356,1 and in Langston vs. Hughes, (1 Maule, & Selw. 593.) In the first of these latter cases, Eyre, Chief Justice, asked whether it could be believed that, a druggist who sold arsenic knowing at the time, that the buyer intended to poison his wife with it, could be allowed to recover the price in a court of justice; and, in the latter case, Lord Ellenbc> rough said that, “a person who sells drugs with a knowl44 edge that they are meant to be so mixed (as to make 44 beer in violation of an act parliament) may be said to 44 cause or procure, quantum in illo (as far as he could,) 44 the drugs to be mixed; so, if a person sell goods with *386 “a knowledge and ire furtherance of the buyer’s intention “ to convey them upon a smuggling adventure, he is not “ permitted by the policy of the law to recover such a 4isale.” And; in the same case, Justice Bailey added, “If a principal sell articles in drier to énable the ven- “ dee to use them for illegal purposes, he cannot l’ecov* “ er the price; the smuggling cáses, which were decided “oh that ground, are very familiar.” And in Lightfoot vs. Tenant (supra,) Chief-Justice Eyre, after putting the strong arsenic case, continued as follows: “Other cases, “ where the means of transgressing a law are furnished, H with the knowledge that they are intended to be used “ for that purpose, will differ in shade; more or less, from “ this strong case, but the body of the color is the samé “in all. No man ought to furnish another with the “means of transgressing the lavr, knowing that he in- “ tended to make that use of them.” Respecting all which Judge Story says, in his Conflict of Laws, “the “ wholesome morality and enlarged policy of this pas* “sage make it-almost irresistable to the judgment.” And, after reviewing the other cases also, to which we have adverted, the same author, though seeming to concede the greater prevalence of the doctrine asserted in Holman vs. Johnson, says, “There seems a strong inclin- “ ation, at present, in the courts of law to hold, that; if “ a contract is made in foreign parts by a citizen of a “ country, to sell goods, which he knows at the time are “to be smuggled, in violation of the laws of his own “'country,he shall not be permitted to enforce it in the “ courts of jus own country, although the contract of salé “is complete, and might be enforced in a like case of a “ foreigner.”
Such being the diverse views and opinions of some of the more prudent and respected of those most learn* ed in jurisprudence, it might be deemed rash in this Court, now to express a conclusive opinion on the points which have been so ably discussed by others who, on each side of the controversy, seem to be sustained by specious and imposing arguments, uncontrolled by positive authority; But, without engaging in the argument, or intending even to express a definitive opionion—~ *387 which, as will presently be seen, is not now necessary— we feel that it may be but proper to suggest, in passing, that we would be inclined neither to concur with, or to dissent from, the doctrine of either party, in extenso and altogether, without limitations or qualification; but should rather incline to the conclusion that, although, as we are disposed to think, a simple knowledge, by a vendor, of the fact that the vendee buys an article for the purpose or with an intention of using it in violation of a public law, or a principle of moral rectitude, may, in strong and flagrant cases, such as that supposed by Chief Justice Eyre, be a sufficient reason for withholding, from either party, the aid of the law- for enforcing the contract, yet there may be cases of a lighter shade or less degree of enormity, in which the same fact might not, alone, be entitled to the same effect: and in the. latter class, we would be inclined to place the beer case decided by Lord Ellen-borough. And the reason why we should be disposed to make any discrimination in consequence of the color or degree of the transgression contemplated by the buyer and merely understood by the seller, and why, also, we are inclined to agree with Chief Justice Eyre to some extent, is just because it does seem to us, that no one can, sell a commodity, knowing that the buyer intends to use it for any purpose so flagitious as that of murder or treason, or other flagrant violation of the fundamental rights of man or of society, without betraying such a degree of turpitude and recklessness as to implicate him, as a voluntary and active participant in the unlawful design, and, as therefore, quantum in illo, willing and instigating a crime, which it is the civil duly of every citizen: to oppose; and that the like knowledge alone, of the buyer’s purpose of unlawful appropriation or use, would not necessarily, lead to the like deduction, as to the motive or conduct of the seller, in every case of inferior degree: as the beer case; the case of a purchase of an article with the intention of again making a fraudulent sale or use of it; the case of a loan of money to a person who borrows for the pui’pose of re-loaning to a stranger at illegal interest; the case of a sale of merchandise by a wholesale merchant, in the regular course of his business, to ong *388 who, when he. buys, intends to, smuggle it into a foreign port, without paying the legal and accustomed duties: and. many other cases of asimilar kind, in which a citizen may be neutral without being guilty of incivism, or of any intentional participation in the unlawful design. In all such cases, it would seem to us, that in a commercial, busy and enterprising age, the law should not attempt to establish a morality so pure, and exact, and vigilant, as that which would make it the legcil duly of every seller of every vendible thing, to become a casuist or censor, so far as to make him responsible for the known motives of the buyer, and an active and guilty co-operator with him in his contemplated violation of law, of principle, <?r of justice.
To an action upon the warranty of a slave, def’t pleads that the pl’tf bought the, slave, in Virginia, with the intention, and for the purpose of importing him in to this State, in violation of the statute prohibiting the importation of slaves as merchandise ;hut does not aver, that the intent of the purchase influenced the consideration, or was even known ;o the seller:— held, on dem’r, that the plea is not good; for the contract cannot be vitiated by the undisclosed intentions of one of the parties. The law, applicable to such a. contract, is the same, in our courts,forastran ger as for a citizen.
*388 And we are also of the opinion, that the hypothetical cases stated, arguendo, by Ellenborough and Bailey, in Langton vs. Hughes, differed essentially from the case they were deciding and were, endeavoring to illustrate by them; for, in the judicial case, it does not appear, that the seller of the drugs had any unlawful intention; but, in the suppositions cases, the words which we have italicised, that is, “in furtherance of the buyer’s intention &c.” “in order to enable the vendee &c.” imply that the vendor participated in the unlawful motive, and co-operated in the unlawful purpose of the vendee.
But, as before suggested, we shall not pursue this embarrassing topic further; because the vendor is not plaintiff in this case, nor does the plea aver that he knew that the the vendee intended to make an unlawful use of the slave. But, the buyer being himself the actor., endeavoring to enforce a stipulation in the contract, the question to be decided is not exactly that which we have been just noticing; but is simply, whether Curie, who, according to the plea, bought the slave for the unlawful purpose of importing him into this State, in' violation of a public statute, deemed by legislative wisdom very important and benificent in its social, civil, and political tendencies, shall be permitted to enforce his contract, in any respect, or to any extent, by the law, and in a Court, of that Commonwealth whose public policy he intended *389 to undermine, by an interdicted use of the slave respecting whom the contract was made.
A contract might be such,that one party could enforce it, when the other could not. See the case put in the text.
Thepurchase of a slave abroad for importation into tb.is State, is not prohibited. The statute extends only to the actual importation •
And here we think proper to observe that, whatever might be the power or the duty of a Court in Virginia, or in any other foreign State, we cannot conceive, or concede, that, in a Court of this State, against whose law the illegal act (as charged) was intended, it can be material whether Curie was, when he bought the slave, a citizen of Kentucky or of a foreign State.
Then the question recurs—is the plea good? Of its morality, we have nothing to say, or to know. Is its matter an available, legal, defence to this action? This is the only question.
Had Steele been the plaintiff, suing for the price, we do not doubt that the matter now presented, could not have been pleaded availably by Curie, because his motives or objects, without Steele’s voluntary participation in them, or even knowledge pf them, could not have affected Steele’s rights. But a contract, enforcible by one of the parties to it, may not be enforcible against him by the other party. For example: had the mere act of buying the slave in Virginia, with an intention to im port him into Kentucky, been denounced by statute as unlawful, and had Curie bought on a credit—Steele knowing nothing of his purpose—the vendor might have recovered the price, by a suit at law; but the vendee could not have enforced the contract in a Court of this State, if his violation of the statute had been pleaded and proved.
But the act of purchasing the slave was not unlawful; nor was the alleged object of the purchase, per se, illegal or cognizable by any law of this State.
And there is an obvious and essential difference between the object of a contract, and the intention, or purpose, or object of only one of the parties to it. A contract founded on. air illegal consideration, or rpade by both parties for an illegal purpose, is itself illegal, and should not be enforced in favor of either party. But an intention to make an illegal or unjust use of a thing purchased, without the knowledge or participation of the vendor, is no pttrt of the contract of sale, anc( *390 does not, therefore, necessarily infect it. According to the pleadings, it was not the object or any part of the consideration of lh.e contract in this case, that the slave should be imported into this State in violation of law-; nor did Steele even know that Curie bought the slave for any such purpose, or with any such intention. Then, can the contract, in other respects legal and binding, be illegal, on Curie’s part, merely because he, when he bought the slave, intended, afterwards, to import him il* legally into this Commonwealth? We are not acquainted with any authority, or even dictum, in support of such a doctrine; and we apprehend that there would be great difficulty in establishing any tangible and definite principle which could sustain it.
The law, being a practical system, adapted to the condition and business of society, does not, in our judgment, and could not, as we think, consistently with its appropriate justice and efficacy, take cognizance of any thing so uncertain, or abstract, as the latent motive or intention of one only of the parties to a coir tract; especially» when the other party has not been affected by it. If this be not true, the consequence must be, that the validity of contracts depends on a subtle and sublimated system of casuistry, altogether incompatible with the certain and uniform operation of human laws as wholesome and practical rules of civil conduct and of legal right; and but few of the contracts of men could safely pass through such an ordeal as they would be subjected to, if the secret object or motive of a purchaser of property, never communicated or carried into effect, should be a legal bar. rier to his right to enjoy its benefits. Such an unexecuted, ex parte, intention is scarcely a fit subject of litigation in a human forum. Besides, the party may change his purpose or relent before any illegal or improper act has been done; and the sole and undisclosed intention of «É party—not being considered in the negotiation, and, therefore, not coming into the contract, or affecting its complexion or character—should not decide its validity.
This we deem a fixed general rule of the common law. It may not be universal, or without any possible exception. Bpt if there be an exception, it must be of a class *391 of cases of such enormity, as to strike the public mind with a very peculiar force, and in which the reason would be peculiar and anomalous, and would not em¿ brace such a ease as this, where no crime of great moral terpitúde hasjieen, eithér committed, attempted, or contemplated.
The plea is not, therefore, in our opinion, goód. Wherefore, the judgment is affirmed»