# Fraternal Army of America v. Douglas Evans, et al.

1. TROVER—*when, lies.* Where an insurance company wrongfully obtains possession of a policy of insurance, its act of retaining possession thereof constitutes a tortious conversion and the beneficiaries thereunder may maintain trover against the company therefor and recover the sum unpaid thereon.

2. AGENCY—*when estoppel to deny, arises.* Where a party in the first instance is a mere volunteer, but the person for whom he acts subsequently avails himself of the acts and methods pursued by such volunteer, an estoppel to deny agency arises.

3. INSTRUCTION—*when party cannot complain of.* A party has no right to complain of an error in an instruction when a like error appears in an instruction given at his request.

Action on the case. Appeal from the Circuit Court of Montgomery County; the Hon. SAMUEL L. DWIGHT, Judge, presiding. Heard in this court at the November term, 1903. Affirmed. Opinion filed June 28, 1904.

JOHN E. HOGAN, for appellant.

LANE & COOPER and JETT & KINDER, for appellees.

MR. JUSTICE PUTERBAUGH delivered the opinion of the court.

This is an action on the case. The declaration avers that Mary E. Evans, wife of Douglas Evans and mother of the other appellees, Rufus Evans and Grace Evans, who sue by their guardian, was a member of the appellant, a fraternal beneficiary society, and held therein a benefit certificate, providing for a $2,000 benefit in case of death; that she was in good standing at the time of her death which it is alleged occurred August 5, 1902; that according to the terms of the policy, upon her death the sum of $400 was payable to her children, and $1,600 to her husband, Douglas Evans. The declaration further alleges that after the death of said Mary E. Evans, the said Rufus and Grace Evans, being minors under the ages of eighteen and twenty-one years respectively, one N. B. Allen was by the County Court of said county duly appointed their

guardian; that after the death of the said Mary E. Evans and furnishing of proof thereof to the defendant, the defendant, through its agents and servants, in order to cheat and defraud the plaintiffs and to obtain fraudulently the possession of said policy, on September 14, 1902, fraudulently represented to the plaintiff, Douglas Evans, that the said policy had been fraudulently obtained; that his conduct in procuring the issuing of said policy was sufficient to subject him to criminal prosecution; and demanded of him the surrender of said policy in consideration that he should not be so prosecuted, and in consideration that they should pay him the sum of $1,000; and through fear, coercion and intimidation, caused the said plaintiff, Douglas Evans, to surrender up and deliver the said policy of insurance to the defendant, who now wrongfully and illegally has possession and control of the same; that the said statements and representations so made by the agents and servants of the defendant as aforesaid, were each and all of them utterly false and untrue at the time they were made, and were at the time known to be false and untrue by the parties making them, whereby the entire amount of said policy was lost to the plaintiffs, to their damage in the sum of $2,000.

To this count was added one in trover, which alleged the loss of said policy, the finding by appellant and the refusal to deliver the same, thereby occasioning damages to the amount of the value of the certificate. To the declaration a plea of general issue was filed. The cause was submitted to a jury, which returned a verdict of $2,060 in favor of the appellees and against appellant. A motion for a new trial was entered and a remittitur entered to the amount of $60, being the interest claimed to have accrued upon the benefit certificate. Upon such remittitur being entered, the motion for a new trial was overruled and judgment entered on the verdict for the sum of $2,000, from which the defendant appeals.

At the close of plaintiffs' evidence and again at the close of all the evidence, the defendant moved the court to peremptorily instruct the jury to return a verdict of "not guilty," which motions were overruled.

The evidence shows that the appellant is a fraternal beneficiary society, organized as a corporation under the laws of the State of Illinois, with its supreme lodge located in the city of Taylorville, Christian county, Illinois; that it had a subordinate lodge known as Dewey post in the village of Fillmore in Montgomery county, Illinois; that one Abrams was the supreme commander of the society and one Reese chairman of the board of directors; that Mary E. Evans, who was born and raised near the village of Fillmore and then about twenty-eight years of age, made an application for membership in said subordinate lodge, February 19, 1901; that Dr. J. M. Hoyt, a practicing physician and member of Dewey post, was at that time regular medical examiner of appellant; that as such he made a medical examination of Mrs. Evans and at the same time filled out the answers to the questions in the application blank; that on March 4, 1901, a benefit certificate was issued to her under the terms of which the sum of $2,000 became payable to appellees, upon her death; that she died August 5, 1902; and that proof of her death was furnished to appellant on August 14, 1902, which stated that she died from inflammation of the bowels. The claim of appellees was allowed by the board of directors of appellant August 19, 1902. Shortly after, a rumor was started to the effect that the deceased had died of consumption, and that Dr. Hoyt, the examining physician, had some interest in the certificate, the result of which was that a special meeting of the subordinate lodge was held to investigate the charges, Saturday evening, September 6, 1902. On September 11 an affidavit was handed to a committee of the local lodge by one Dr. Hendricks, who had been the attending physician of Mrs. Evans during her last illness. The affidavit, which was subscribed and sworn to by Douglas Evans, was as follows:

EXHIBIT 1.

"STATE OF ILLINOIS, } ss.
Montgomery County. }

FILLMORE, ILL., September 11, 1902.
Douglas Evans, under oath, makes the following state-

ment: That he did insure his wife, Mary E. Evans, for the amount of $2,000, in the Fraternal Army of America, with the understanding that I was to get $1,000, six hundred for myself and four hundred for my two children, and that Dr. Hoyt was to have the other thousand, and Dr. Hoyt was to keep all dues paid upon that thousand, and I paid on my thousand at the rate of 50 cents per month, and I suppose Dr. Hoyt paid the dues, 50 cents per month, on the other thousand, and if there is anything wrong, I had no intention on my part of wrongdoing the company in any way, but I have honestly paid the dues on the one thousand dollars that was made to me and the children, and I claim that amount; then I am ready to surrender the policy, and the company can do as they please with the other thousand that is claimed by Dr. Hoyt.

DOUGLAS EVANS.

Subscribed and sworn to before me this 11th day of September, 1902.

  (SEAL.)        E. H. DONALDSON, Notary Public."

About midnight on September 14, Abrams, the supreme commander, and Dr. Nelson, the head physician of appellant, called upon appellee Douglas Evans at his home in Fillmore, and obtained from him the surrender of the certificate and the execution of a further statement as follows:

EXHIBIT 2.
" September 14, 1902.

I, Douglas Evans, one of the beneficiaries named in the Benefit Certificate No. 7563 in the F. A. of A., having made the statement hereto attached, which said statement is true, hereby attach said benefit certificate hereto and deliver the same to Lindsey Reese, chairman of the board of directors of the F. A. of A., for cancellation. I also request the withdrawal of the proof of death of Mary Evans upon said benefit certificate from the files of said society and request that said proof of death be returned to me at once, whereby I withdraw all claims I have against said F. A. of A.

DOUGLAS EVANS."

No release of their claim was procured from the guardian of the minor appellees. On September 17 the order allowing the claim theretofore made was set aside by the board of directors of appellant, whereupon appellees brought suit to recover the amount due under the certificate.

Appellant contends that the court on the trial admitted improper evidence; that the evidence fails to show that fraud was practiced in procuring the surrender of the certificate; that the certificate was originally obtained by the deceased through fraud and misrepresentation; that the verdict was against the law and the manifest weight of the evidence, and that the court erred in its rulings upon the instructions.

It appears from her application for membership, upon which the certificate was issued, that Mrs. Evans, in answer to the questions therein propounded, stated that she did not have, and had never had, consumption. It is contended by appellant that such answer was untrue, and that she knew it to be so, and that, inasmuch as the answers contained in the application were expressly warranted to be true, such representation was fraudulent, and made void the certificate. There is evidence tending to show that at the time she made the application and for some time prior thereto, Mrs. Evans was afflicted with the disease known as tuberculosis of the lungs or consumption, and that both she and her husband were aware of the fact. On the other hand, the evidence introduced by appellees upon the question, tends to show that while she had had at one time acute catarrh, from which she afterward recovered, and at other times difficulty in breathing, and was occasionally afflicted with a cough, she had never had what is known as consumption. The burden of proving that the answer was untrue was upon appellant, and these questions were all of fact for the jury to determine. The evidence relating thereto was conflicting, and we are unable to say that the finding of the jury upon the question was manifestly against the weight of evidence.

Appellant also contends that Dr. Hoyt, the examining physician of appellant, who passed the application of Mrs. Evans, did so with full knowledge that she, at the time, had consumption, and for the express purpose of obtaining one-half of the proceeds of the certificate at her death, under an agreement or understanding with her and

her husband to that effect. The testimony of both Hoyt
and Evans tends to show that Hoyt retained possession of
the certificate for the purpose only of paying the assess-
ment thereon, it being inconvenient for Evans or his wife
to do so, on account of the frequent absence from the vil-
lage of the adjutant of the lodge, who collected the assess-
ments; that after the payment of three assessments, Mrs.
Evans was inclined to permit the insurance to lapse, and
it was then agreed that Hoyt was, from that time on, to
pay one-half of the assessments, and to receive one-half of
the benefit upon the death of Mrs. Evans. While several
witnesses testified that Hoyt stated at the meeting of the
local lodge, when the matter was under consideration, that
he had no interest in the policy, he testified that what he
said was that he had no interest in it at the time it was
issued. Although the evidence offered by appellant tends
to support its contention, this question was also one for the
determination of the jury, and inasmuch as the evidence is
conflicting, we are not inclined to interfere with its con-
clusions with reference thereto.

The evidence relating to the making of the affidavit, the
withdrawal of the claim, and surrender of the certificate is
substantially as follows: Appellee, Douglas Evans, testi-
fied that on the Monday following the special meeting of
the local lodge, at the request of Dr. Hendricks, he called
at his office; that Hendricks then told him that Dr. Nelson
had been down there to see him, and had told him that
they had circumstantial evidence against witness and Dr.
Hoyt, sufficient to hang them if they killed a man; that if
he, witness, were charged with murder, they had sufficient
evidence to hang him; that Hendricks then showed him a
written statement and said that if he would sign it, he
would insure him $1,000 and the matter would then be
dropped, otherwise they would be prosecuted; that on
the Wednesday following Hendricks met him and told him
that if he was going to sign the statement he had better do so
as he had only one more day and then it would be too late;
that he then went to Blaylock's with Hendricks and signed

and swore to the affidavit, Exhibit 1; that it was read to him but nothing was said by him as to what it should contain, and that he recognized it as being the exact truth about the transaction; that afterward Abrams, Reese and Hoyt came to his house, showed him the affidavit and said they wanted the certificate; that they went to Hoyt's office, where witness signed the paper, Exhibit 2, and surrendered the certificate.

One Blaylock, a brother-in-law of Douglas Evans, testified that the affidavit was signed at his house by Evans, in the presence of Hendricks, Donaldson and himself; that it was written there by Donaldson, at the dictation of Hendricks, from another paper and was then read over to Evans, who, after suggesting a correction which was made, signed and swore to it and said it was a correct statement of the condition of the affair; that Evans seemed, at the time, to be in a confused and frightened condition. Blaylock further testified that prior to the time the affidavit was made, Hendricks had stated to him that he had a letter in his possession that he was not at liberty to show, that would put these men where the dogs wouldn't bite them, or intimated to witness that they would hang them if Evans did not sign the statement, but that if he did sign it, he would obtain for him $1,000; that he immediately delivered the message to Evans; that at the time Evans signed the statement at his house, he was greatly confused on account of these threats, and he came to the house of witness crying and begging him to take care of his little children if they put him in prison; that he was so frightened that he laid out in the hazel brush in his pasture for fear some of them would come after him; that he was "crying like a whipped dog."

One Donaldson, a notary public, testified that the day before the affidavit in question was signed, Hendricks showed him a statement, of which the affidavit is a copy, with a few alterations; that Hendricks said that if Evans would sign the statement it would secure him $1,000; that he had a letter in his possession which he was not at liberty to

show at present; that the next day he went to Blaylock's house and read the affidavit to Evans, who signed and swore to it without objection; that in the opinion of witness, when Evans signed the affidavit he hardly knew what he was doing.

Dr. Hendricks testified that prior to the execution of the affidavit he had a talk with Evans, who was troubled about the matter, and asked his advice; that he advised Evans to make some statement to the fraternity and clear himself; that he and Donaldson afterward went to the office of witness where Evans made a statement, which witness wrote in a book; that when they arrived at Blaylock's house, Evans and Blaylock were there; that witness had written the statement out substantially the way Evans had stated the facts to him, and that after making some changes it was read over to Evans, who signed and swore to it and said that it was correct; that there was nothing unusual in his appearance and he seemed to be in his usual condition; and that witness afterwards handed the affidavit to the committee of the local lodge, at their request. He denied that he ever told Blaylock that he had a letter, the contents of which he was not at liberty to disclose, or that if Evans would sign the affidavit he would give him $1,000 and save him trouble.

Abrams, the president of appellant, who resided at Taylorville, testified that the Saturday night following the lodge meeting at which the matter had been under consideration, he, in company with Reese, the chairman of the board of directors, went to Fillmore; that owing to a wreck upon the railroad they failed to arrive until nearly midnight; that they went to the residence of Dr. Hoyt, where witness handed him a copy of the affidavit, Exhibit 1, and told him, he, Hoyt, was instrumental in getting them into trouble; that he, Hoyt, had obtained the certificate under the circumstances detailed in the affidavit and it was his duty to take it up, and that they expected him to do so; that Hoyt then went with witness and Reese to Evans' house, where Hoyt told Evans they had come for the policy

and that he had better give it to them; that Evans
handed the certificate to witness, who told him there was a
guardian to be consulted; that that certificate should not
be turned over this way; that he should go and see the
guardian and get his consent; that Evans said he would go
and see; that they then returned to Hoyt's office; that Evans
arrived shortly after and said the guardian would not come
that night, but promised that he would procure the guard-
ian's consent and send it to the office of appellant; that
Exhibit 2 was then read to and signed by him; that Ex-
hibit 2 was then attached to the affidavit and the papers
given to Reese. He further testified that he knew nothing
of the procurement of the first affidavit until it was re-
ceived at his office by mail; that Dr. Hendricks was not a
member of the appellant, and had no authority whatever
to procure any affidavit or statement from Evans.

Dr. Hoyt testified that Abrams and Reese came to his
house between twelve and one o'clock Sunday morning,
showed him the affidavit, and told him they came for Evans'
policy; that the affidavit showed that the thing was done
by fraud, and the easiest way out was to get the policy;
that witness told them he did not have the policy; that
Abrams said he would like to have the policy that night
and get out on the early train, so that their business down
there would not be known; that witness read the affidavit
over and told them there was no admitted fraud on his
part, but that he was willing to surrender the policy; that
they then said if they could obtain the policy, it would avoid
further trouble; that they would not make trouble without
it was necessary, but that they were going to get that
policy; that they all went to Evans' house; that Abrams
showed Evans the affidavit and stated that they had come
after the policy; that Evans offered to give them the policy
but they told him to wait until they made out a release;
that then they all went to witness's office, where Abrams,
after repeating to Evans substantially what he had said to
witness, wrote out the paper, Exhibit 2, and Evans signed
it; that Abrams then asked Evans to go for Allen, the

guardian of the children, and ask him to come down; that Evans went to see Allen, and returned stating that Allen refused to come; that the policy was then surrendered to Reese.

We are of opinion that the foregoing evidence tends to establish the fact that the surrender of the certificate by Evans was procured through fear induced by threats and false representations of appellant's agents, as charged in the first count of the declaration; that appellant therefore obtained the certificate illegally, and that its act of retaining possession thereof was a tortious conversion. It is well settled that where an insurance company wrongfully obtains possession of a policy of insurance, its act of retaining possession thereof constitutes a tortious conversion, and the beneficiaries thereunder may maintain trover against the company therefor, and recover the sum unpaid thereon. Hayes v. Mass. M. L. Ins. Co., 125 Ill. 626. The peremptory instructions offered by appellant were therefore properly refused.

It is strenuously contended by appellant that the testimony of Evans, Blaylock and Donaldson, as to conversations with Dr. Hendricks with reference to the procuring of the affidavit, was incompetent against it, in the absence of proof that Hendricks was its agent for any purpose. Abrams, Nelson, and Hendricks himself, all testified that he was not an officer of the appellant society, and that he had no authority from it or its officers to procure the affidavit in question from Evans. It appears, however, that on Sunday, the day following the meeting of the local lodge, Dr. Nelson, the head physician of appellant, called at his office and remained for about an hour. He testified that he "did not know" that they discussed the Evans matter. If it be true that Hendricks was not authorized to and was not acting for appellant in the matter, it was probably difficult for the jury to comprehend why he should have taken such unusual interest and trouble in the matter. He was not an officer of the law, whose duty it was to detect crime and prosecute offenders. Inasmuch as he was but a private citi-

zen, his zeal and industry in the matter, while perhaps commendable, and in the interest of public justice, was, to say the least, unusual. The contention of appellant that he was acting merely as a friend of Evans in the matter, is unreasonable and improbable under the circumstances. Conceding, however, that he was, in the first instance, but a mere volunteer in the matter, appellant, having availed itself of his acts and methods in procuring the affidavit, by the use of which it clearly appears the surrender of the certificate was obtained, thereby ratified his acts, and is, in consequence, estopped from denying his agency in the matter. Ansonia v. Cooper, 64 Conn. 544; Larsen v. Ins. Co., 208 Ill. 171; R., R. I. & St. L. R. R. Co. v. Shunick, 65 Ill. 229; Ins. Co. v. Ward, 90 Ill. 545. We think the evidence was clearly competent under the circumstances.

By the fourth instruction given to the jury at the request of appellees, the jury were told that if they believed from a preponderance of the evidence, that the plaintiffs had made out their case as laid in the declaration, then their verdict should be for the plaintiffs. Appellant contends that the instruction, in effect, told the jury that if the plaintiffs had proved the material allegations of the declaration, they were entitled to recover, and that it was therefore erroneous, as it left it to the jury to determine what were the material allegations. Even if the instruction could be construed as contended, appellant is estopped from complaining, for the reason that it asked and the court gave an instruction which told the jury that before plaintiffs could recover, "each and every material allegation in the declaration necessary to a recovery must be proved by a preponderance of the evidence," etc. A party has no right to complain of an error in an instruction when a like error appears in one given at his request. I. C. R. R. Co. v. Byrne, 205 Ill. 21. The instruction, however, was unobjectionable. Mt. O. Coal Co. v. Rademacher, 190 Ill. 542.

We find no prejudicial error in the record and the judgment will therefore be affirmed.

*Affirmed.*