CHICAGO—FIRST DISTRICT—APRIL, 1917.    387

Woodbury v. Ocean Acc. & Guar. Corp., Ltd., 205 Ill. App. 387.

## George Trumbull Woodbury, Appellant, v. Ocean Accident & Guarantee Corporation, Ltd., Appellee.

## Gen. No. 21,800.

1. INSURANCE, § 488*—*when evidence is insufficient to show justification for dispute as to right of recovery under accident policy.* Evidence *held* to tend strongly to show that at the time of plaintiff's accident, on account of which he brought action to recover under his accident insurance policy with the defendant, and at the time of his settlement under such policy and executing a release, there was no justification for any dispute concerning his occupation nor the amount of indemnity to which he was entitled under the policy.

2. TRIAL, § 196*—*when direction of verdict is proper.* If either at the close of plaintiff's evidence or of all the evidence there is no evidence, or but a scintilla of evidence, tending to prove the material averments of the declaration, the jury should be directed to return a verdict for the defendant.

3. TRIAL, § 195*—*when case should be submitted to jury.* If there is in the record any evidence from which, if it stood alone, the jury could, without acting unreasonably in the eye of the law, find that all the material averments of the declaration have been proven, the cause should be submitted to the jury, even though a verdict for the plaintiff would have to be set aside on a motion for a new trial because of the manifest preponderance of all the evidence.

4. INSURANCE, § 490*—*when fraud and duress in procurement of release is question for jury.* Evidence of fraud and duress in the procurement by defendant's adjuster of plaintiff's release of defendant's liability under its policy of insurance issued to plaintiff, *held* ample to justify its submission to the jury, in an action to recover the amount of the policy.

5. INSURANCE, § 488*—*when incapacity of insured to make settlement is question for jury.* Evidence bearing upon the physical and mental condition of plaintiff at the time he made settlement under his accident insurance policy for the results of an accident tending to show he was then incapacitated for making such settlement, *held* to be for the jury to pass upon.

6. INSURANCE, § 488*—*when extent of influence of injuries on will in making settlement is for jury.* The extent of the influence of plaintiff's injuries upon his will and judgment in making a settlement under his accident insurance policy, *held* to be for the jury.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

7. EVIDENCE, § 33*—*when presumed that common law is in force.* In the absence of evidence as to the law of another State, it will be assumed the common law prevailed there at the time in question.

8. SEALS, § 2*—*what is not instrument under seal.* An instrument executed with a scroll, *held* to be, at common law, not one under seal.

9. SEALS, § 6*—*what is effect of seal.* A seal, generally speaking, merely adds "factitious dignity" to a document; more conclusiveness, as mere evidence of the agreement of the parties.

10. CONFLICT OF LAWS, § 12*—*what law governs as to release.* Where a release is presented as a defense to a cause of action, the law of the place where the release was executed as to its execution should be applied.

11. INSURANCE, § 491*—*when release is not bar to action on accident policy.* Where an action was brought to recover on an accident insurance policy alleged to have been tortiously obtained from plaintiff by fraud and duress with a release of liability under the policy of the insurer obtained at the same time and under the same circumstances, the questions of defendant's guilt of such tort and, if guilty, of what damages were thereby inflicted, *held* to be not affected by the fact of such release.

Appeal from the Circuit Court of Cook county; the Hon. LOCK-WOOD HONORE, Judge, presiding. Heard in this court at the October term, 1915. Reversed and remanded. Opinion filed April 18, 1917. Rehearing denied May 9, 1917.

FREDERICK A. BROWN and RAYMOND S. PRUITT, for appellant; JOHN MCDONALD, of counsel.

WILKERSON, CASSELS & POTTER, for appellee; RALPH F. POTTER and KENNETH B. HAWKINS, of counsel.

MR. JUSTICE TAYLOR delivered the opinion of the court.

This is an appeal from a judgment entered by the Circuit Court of Cook county, on March 5, A. D. 1915, in favor of the Ocean Accident & Guarantee Corporation, Ltd., appellee (hereinafter designated defendant). The judgment was based on the verdict of a

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

jury, directed by the trial judge, at the close of all the evidence in the case.

In the year 1908, the defendant had issued to appellant, George T. Woodbury (hereinafter designated plaintiff), an accident insurance policy, which provided, *inter alia,* for the payment of $12,500 in case the insured lost either hand or foot solely through external, violent and accidental means. The occupation of the plaintiff was stated in the insurance policy as that of vice president of the Columbus Safe Deposit Company with the ordinary duties of office and traveling.

On October 1, 1910, the plaintiff having moved from Chicago to Phoenix, Oregon, and while the policy was still in force, received a serious injury to his right leg, through the accidental discharge of a gun, and as a result of the injury his right foot had to be amputated above the ankle.

At the time of the accident plaintiff had additional accident insurance, but for different amounts, in both the United States Casualty Company and the Continental Casualty Company. Plaintiff brought suit in the Circuit Court of Cook county on each of the accident policies, and as the material facts in each suit were substantially the same, the three suits were by agreement of counsel consolidated. Separate appeals were prayed and allowed. The plaintiff has filed a similar brief in each of the three cases; and each of the defendants (appellees) has filed a separate and different brief.

The declaration contains two counts, the first of which contains the following averments:

That on October 23, 1910, the plaintiff owned and possessed an accident policy, which provided that the defendant would pay the plaintiff $25,000 if he should accidentally lose either foot; that on October 3, 1910, he lost his right foot by the accidental discharge of a shot gun, and the policy then had a value of $12,500,

390        Appellate Courts of Illinois.

Woodbury v. Ocean Acc. & Guar. Corp., Ltd., 205 Ill. App. 387.

but that the defendant sent an adjuster to plaintiff, while he was injured and in a weakened condition from the shock of the injury and two operations, who menaced and threatened the plaintiff that unless he would surrender the policy for the sum of $6,250.00 in full settlement thereof, the defendant would cause plaintiff to be criminally prosecuted for intentionally having shot off his foot for the purpose of defrauding the insurance company; that he, the adjuster, told the plaintiff that he had evidence of such fact that would probably result in sending plaintiff to the penitentiary; that said statement was false; that said adjuster further stated that if he did not accept the sum of money so offered, the defendant would never pay; that it had an abundance of money to defend any suit and would keep the plaintiff in court for years and bankrupt him, and that if plaintiff succeeded in staying out of the penitentiary, he would be unable to support himself and wife because of the trouble defendant would make him; that said statements were made in the presence of plaintiff's wife, who was in a run down physical condition from nursing of plaintiff, and were made for the purpose of terrorizing her and having her influence plaintiff to accede to the demands of said adjuster; that said adjuster so terrorized them that by reason of such *menace,* threats, and in fear and apprehension thereof, *plaintiff* delivered said policy to defendant while there still remained due on said policy $6,250, which was then and there the value of said policy.

The second count is in trover and contains the following averments:

"That on, to wit, the 23rd day of October, 1910, the defendant was lawfully possessed of the policy of insurance heretofore described, which on said date had a value of $12,500 by reason of plaintiff having accidentally shot off his foot, which policy was lost by the plaintiff and came into the possession of the defendant, who, knowing it to belong to the plaintiff, nevertheless converted the same to its own use and refused to deliver it to the plaintiff, though often requested so

to do and disposed of the same to the damage of the plaintiff in the sum of $10,000.''

To the declaration, the defendant filed a plea of the general issue, and also a special plea, setting forth that after the occurrence of the acts alleged in said declaration, plaintiff executed a release under seal, discharging the defendant from all claims. To the latter's special plea the plaintiff filed a general replication.

The case was tried before a jury, and at the close of all the evidence, the plaintiff's and the defendant's, upon a motion of the defendant, the court instructed the jury to find the defendant not guilty.

It was expressly admitted by the defendant upon the trial that on October 3, 1910, plaintiff suffered the loss of his right foot, solely through external, violent and accidental means; that due proofs of loss were furnished, as required by the policy in question, and that said policy was in force and effect at the time said loss occurred.

The plaintiff contends that the defendant, through its adjuster, obtained the said policy from the plaintiff by fraud and duress, and caused the plaintiff to surrender it for one-half its value.

The defendant contends: (1) That on account of an alleged change in the insured's occupation to a more hazardous risk, the defendant was liable only for the amount of indemnity the premium paid by the insured would purchase in the more hazardous classification, and that the defendant did not pay that amount; that because of the dispute as to plaintiff's occupation the claim was unliquidated, and the settlement and release were supported by a good consideration, and the plaintiff was barred from his action at law; (2) that no fraud or duress were shown in obtaining the policy from the plaintiff, and the court rightly directed a verdict; (3) that the release, being under seal, could not be attacked in an action at law.

392    APPELLATE COURTS OF ILLINOIS.

Woodbury v. Ocean Acc. & Guar. Corp., Ltd., 205 Ill. App. 387.

We shall consider those contentions *seriatim.*

As to the alleged change in the occupation of the plaintiff: At the time the plaintiff took out the insurance he was employed by the Columbus Memorial Building, and had been for about eighteen years, as renting agent. On June 10, 1910, he went to Phoenix, Oregon, where his father-in-law lived, to go into the ranch business. The plaintiff himself testified that six or eight weeks after his arrival in Oregon he gave up the idea of going into the ranch business and went into the real estate business at Medford, Oregon, where he claims he had desk room; that he had quite a list of property for sale; that he had some real estate for sale for one Wilber, in Ashland; that after he went into the real estate business he was not directly interested in the ranch; though he did some chores; that he was not in any other business than that of real estate after September 1, 1910, and at the time of the accident; that on the day of the accident he had made all preparations to go east, grip packed, money in his pocket, contract for the commissions he was to receive, signed up, etc.

The testimony of E. J. Wilber is also to the effect that the plaintiff was engaged in the real estate business a month or so prior to October 1, 1910, the date of the accident; that plaintiff's office was in Medford, and that on October 1, 1910, the plaintiff and he were interested in selling a subdivision of 1,800 acres of land, and on that day Wilber himself took some plats, blue prints, maps and other data, to the plaintiff's house. The plaintiff's father-in-law, C. S. Redfield, testified that the agreement between plaintiff and Wilber was signed just before the accident happened.

The testimony of the defendant's chief witness, Wisner, the adjuster, also, in a measure corroborates the testimony of plaintiff and Wilber. He testified that the plaintiff showed him a receipt for $10 from Mr. Patterson, for use of his desk; that his recollec-

tion was that the receipt was for the month of September; that when he talked with Wilber, the latter pointed out a tract of land and said that he had made arrangements with the plaintiff to go to Chicago and interest his friends; that the plaintiff had gone into the real estate business with him.

Plaintiff's exhibit 9 shows a letter head, which the plaintiff testified was used by him when he engaged in the real estate business. It is as follows:

"G. T. Woodbury,
Fruit and Timber Lands,
Medford, Oregon."

On August 20, 1910, the plaintiff wrote a letter to the defendant company, stating that he had made arrangements to move to Medford and go into the real estate business on September 1st, and requesting advice as to what would be necessary for him in regard to his insurance. On August 24, 1910, the defendant company answered plaintiff's letter (in part) as follows: "Your kind favor of August 20th at hand, and your new occupation will not necessitate any change in your policy."

It seems impossible to consider the testimony of the plaintiff and Wilber, and the admission of the defendant's witness, the adjuster, in regard to the receipt from Patterson, and the answer of August 24, 1910, of the defendant company, that the new occupation would not necessitate any change in his policy, without concluding that there was evidence that tended strongly to prove that there was no reasonable dispute of any kind as to the occupation of the plaintiff; and that, as far as the defendant was concerned, no change had taken place in occupation or risk to justify any dispute or contention on the part of the defendant that the claim of the plaintiff was unliquidated. The evidence that he was in the real estate business at the time of the accident was quite overwhelming. The tes-

394    APPELLATE COURTS OF ILLINOIS.

Woodbury v. Ocean Acc. & Guar. Corp., Ltd., 205 Ill. App. 387.

timony of the neighbors who were called, and knew generally what he did about his wife's ranch, is, on the whole, entirely consistent with the testimony of both the adjuster and Wilber on that subject.

We are bound to assume, therefore, that the evidence tends strongly to show that at the time of the accident and at the time of the settlement there was no justification for any dispute concerning the occupation of the plaintiff, nor the amount of indemnity to which he was entitled.

As to the alleged fraud or duress in obtaining the policy from the plaintiff, and making a settlement:

It may be well (1) to consider the evidence as to the physical and mental condition of the plaintiff at the time of the settlement; and then (2) the evidence as to the alleged threats and intimidation and representations of the adjuster.

As to the physical and mental condition of the plaintiff: On October 1, 1910, between 2:00 and 3:00 p. m., the plaintiff went out to a tool house, which was about 150 feet from the rear of the main house, and reached up for his rifle. It got away from his hands, struck the door and dropped muzzle down, and then fell over, and, as it did so, it went off, the bullet going transversely through his right leg about three inches above the ankle. In about half an hour Dr. Malmgren arrived, and the plaintiff was put on a stretcher, his wound dressed, and he was taken in a wagon to a hospital at Medford, where he arrived, after intense suffering, about 6:00 o'clock p. m. He was given an anesthetic and three inches of the bones were taken out. The bullet, which was a soft nose bullet, had entered from the inside of the leg and had cut in two, transversely, both the tibia and fibula. The first operation was a wiring of the severed ends of both those bones. There were a great many loose fragments of bone in the wound. Dr. Malmgren testi-

fied that the bullet by its circular motion had ground up the bones and that it took half an hour to clean out the bone; that it bled quite freely and the plaintiff suffered intensely. Forty-eight hours afterwards, on October 3, 1910, the circulation after the first operation being very poor, amputation was performed. The evidence of the doctors and of the plaintiff is that the injury and the operations caused a considerable loss of blood and a great amount of suffering.

The plaintiff testified that after the accident, while on the way to the hospital, and at the hospital, he lost two or three quarts of blood; that at the first operation they took out three inches of bone; that he was hardly out from under the influence of one anesthetic when they put him under another; that he did not remember much that happened in between the two; that the second operation was performed at 2:00 p. m. on Monday, October 3, 1910; that after the second operation "the chloroform nauseated me, and my weakened condition made me weaker. It was a long time before I could take anything on my stomach, due to the effects of the chloroform"; that his wife and trained nurses took care of him; that after the amputation the wound was dressed "very frequently," they would undo it and see the condition it was in and then do it up again and put on fresh bandages"; that they put surgeon's plaster on to hold it together; that when they would remove them it was very painful; that pus was present, and a drainage tube kept in for some time; "that several times the pieces of bone that they had been unable to remove, worked out to the surface, and there was one or two that broke out, and other times they would cut in and dig them out"; that "it was at least five months before the last one came out"; that after he had been at the hospital several weeks, owing to the fact that it was crowded, he was taken to the physician's house, where he could receive attention; that

"the doctor was there and dressed the wound the day that this settlement was made"; that he remained at that doctor's house three or four weeks, after being three weeks at the hospital; that he was nursed at the doctor's house by his wife; that the doctors called every day; that he was under the care of a physician until the following March; that until then he had some fever.

As to threats, intimidations and representations of the adjuster: The plaintiff testified that Wisner, the adjuster, called on him on November 5, 1910, at the hospital; that he told him he had come out to adjust his claim; that when he left he said he wished to make some investigation and would be back again; that he came back the next morning before the plaintiff was up; that he said "he had some very suspicious evidence, some evidence which was very suspicious" regarding the accident; that he said, "it was rather unusual for a man out in the country to have so much insurance"; that in the morning and in the afternoon both, "he did talk about people going to the penitentiary where the evidence was less against them than it was against me"; that "he cited a case of a man at Buffalo who threw his arm under a street car and it was cut off. He had to sue the companies and they sent him to the penitentiary, and he cited several cases, two or three more, I can't say just where"; that when plaintiff told him that he would not settle for anything but the face value, he said "they will bankrupt you and possibly put you in the penitentiary"; that "they will ruin your reputation anyway"; that "they have unlimited funds and the best legal talent in the country, it is foolish for you to attempt to fight them"; that he, the plaintiff, told the adjuster that he was in no condition to talk the matter over; that there was time enough to settle it; that he said "it was either $10,000 (meaning a fifty per cent.

settlement of the policies) on the one hand, or litigation on the other, with the penitentiary as the possible wind up for me"; that he said "you are very foolish if you don't accept this offer of mine. You are getting along at the time of life when it will be hard for you with only one leg to support your wife."

In the afternoon, between 2:00 and 3:00 o'clock, the adjuster visited the witness again, and stayed about an hour. Mrs. Woodbury was there, and had been present at the prior conversations. Plaintiff testified that the adjuster talked about the same thing in the afternoon as in the forenoon, "about the possibility of my going to the penitentiary, and that I hadn't a chance on earth to win a suit if I fought it"; that that night "we did not sleep a wink all night" (meaning himself and wife); that "I was greatly worried." "I was worried talking this over with my wife"; that they talked about it all night long; "I was rather run down from the loss of blood and very weak, they were trying to build me up"; that he had no appetite during the time Wisner visited him; that the wound was painful for months.

The adjuster called again on the third morning, but had to wait some minutes until the doctor got through dressing the plaintiff's wound, the plaintiff being in bed. Plaintiff testified further that the dressing of the wound that morning was painful; that the adjuster reiterated the statements about the penitentiary, "they were the things that stood out prominent, that was the thing that stood out prominent most of the time"; that that morning he finally agreed to make a settlement, and the adjuster went away and said "he would be back in the afternoon with the drafts, and that he was in a great hurry and must get right out of town"; that he came back about 2:00 o'clock with the papers ready; that the settlement was for one-half, with some addition for miscellaneous fees; that on the

morning when the wound was dressed by the doctor and the matter finally settled, his condition was "very weak and nervous," and (referring to his wife, who had been present at all the interviews, and who he testified had lost thirty pounds), "her weakened condition induced me to make this settlement and avoid further trouble and friction"; that more than once during the several interviews he told the adjuster he was in no condition to do business; that at one of the interviews the adjuster said it was "rather peculiar that there was no witness to the accident"; that he asked him to illustrate how it happened, and the witness said he could not stand up; that Wisner then stood up in the doorway and went through the motions, and then said, "you see how ridiculous that would appear before a jury"; that Wisner convinced him, by what he said, that if he brought suit on the policies he would never get a cent; that when the adjuster threatened in case the companies were sued that they would prosecute him criminally "I did not know what they might do. Innocent men have been sent to the penitentiary"; that he believed him; that he did not read over the papers which were given him that afternoon to sign; that the adjuster took the policies away with him. The witness, Wilber, testified that he telephoned the plaintiff he was not in any condition to make a settlement. There is some evidence that the plaintiff talked with a lawyer, or some one called Judge, but it is too uncertain to justify any definite inference. Dr. Conroy testified that the plaintiff was very nervous; that the negotiations with the adjuster had a bad effect upon his mental condition and worried him a great deal. Redfield testified that he was not in a normal condition either mentally or physically.

The question arises, and it is the substantial matter upon this appeal, was there sufficient evidence tending to show fraud or duress to justify the trial judge in submitting it to the disinterested judgment of the jury.

In determining the duty of the trial judge in such a case, the principle of law applicable is set forth quite exhaustively by Mr. Justice Scott in *Libby, McNeill & Libby v. Cook,* 222 Ill. 206, in the following language:

"In either case (meaning at the close of plaintiff's or all the evidence), if there is no evidence, or but a scintilla of evidence, tending to prove the material averments of the declaration, the jury should be directed to return a verdict for the defendant. If, however, there is in the record any evidence from which, if it stood alone, the jury could, 'without acting unreasonably in the eye of the law,' find that all the material averments of the declaration had been proven, then the cause should be submitted to the jury. (*Frazer v. Howe,* 106 Ill. 563; *Simmons v. Chicago and Tomah Railroad Co.,* 110 id. 340; *Bartelott v. International Bank,* 119 id. 259; *Offutt v. Columbian Exposition,* 175 id. 472). Such evidence last mentioned fairly tends to prove all the material averments of the declaration, and such evidence, standing alone, is sufficient to sustain, warrant or support a verdict in favor of the plaintiff, even though it may be that a verdict for the plaintiff, if returned, would have to be set aside on a motion for a new trial because against the manifest preponderance of all the evidence."

Upon an analysis of the evidence in the instant case, we find that it proves, or tends to prove, that the injury to the plaintiff was accidental; that the defendant knew that the plaintiff had not changed his occupation and was therefore entitled to $12,500; that a settlement was made for half that sum; that the adjuster knew at the time the settlement was made, and prior thereto, that the plaintiff, by reason of two major operations within approximately a month of the date of settlement, had suffered such nervous shock and physical change that he was not in a normal condition; that while the plaintiff was in that enfeebled condition, the adjuster, representing the defendant, by insidious suggestions as to suspicious evi-

dence and the possibility of the plaintiff going to the penitentiary, persuaded plaintiff to make a settlement for a grossly inadequate sum. The evidence tends to show that the plaintiff agreed to surrender his right to half the amount of the policy when there was no valid defense against its payment, and no consideration for its release.

In view of the evidence, which in the case of *Fraternal Army of America v. Evans,* 114 Ill. App. 578, was considered sufficient to support a verdict, we feel compelled to the conclusion that there was in this case ample evidence of fraud and duress to justify its submission to the jury.

The jury are entitled to consider, as an element in the case, the evidence which bears upon the physical and mental condition of the plaintiff at the time the settlement was made. In *Buchanan v. Sahlein,* 9 Mo. App. 552, the court uses the following significant phrases, "the will of an innocent person of common firmness," "the will of a person of ordinary courage." In the instant case, the evidence, tending to prove that the plaintiff at the time of the settlement was incapacitated, should be passed upon by the jury. The injury made an immeasurable difference to the plaintiff; it caused a permanent change in his capacity and possibilities as a man; it limited at once his scope and his future conduct; and bearing that in mind, together with the effect of the shock and pain upon his mind and upon his will, it became a proper subject for the consideration of the jury. It is safe to assume that the injury and its consequences, as they existed at the time of the settlement, lessened his will to resist suggestion and the influence of others, and enfeebled his normal power of judgment. The matter of extent was for the jury. As to the quantity, applying the principle so exhaustively expounded in *Libby, McNeill & Libby v. Cook, supra,* we are of the opinion that

there was plenty of evidence to justify submitting it to the disinterested judgment of the jury.

As to the release under seal being a bar to plaintiff's suit:

The release in this case was executed with a scroll which, at common law, was not recognized. No evidence as to the law of Oregon, where the instrument was signed and sealed, was offered. We assume, therefore, that the common law prevailed at the place of execution. In Oregon, it follows, the instrument would not be considered as one under seal. What effect, then, should be given it here when presented and interposed as a defense? The defendant claims that the plaintiff is without remedy at law until he has gone into equity and has the release set aside. The plaintiff contends that as it is not a sealed instrument according to the law of Oregon, where it originated, it is not such here. The question seems never to have arisen in our courts. A seal, generally speaking, merely adds "factitious dignity" to a document; "more conclusiveness, as mere evidence of the agreement of the parties." *Steele v. Curle,* 34 Ky. 381. Many cases are found where it has been determined that the *lex fori* governs the form of action, whether, for example, it shall be in assumpsit or covenant, and there is, perhaps, some justification for such law. Where, however, as here, the release is presented as a defense to a cause of action, we are inclined to agree with the court in *Waln v. Waln,* 53 N. J. L. 429, and apply the law of the place where the release was executed.

Further, it may be said that the plaintiff is not suing upon the policy, but for the tort committed in obtaining it. Two questions may be considered as involved: (1) Was the defendant guilty of a tort in obtaining the policy; (2) if guilty, what damages were thereby inflicted upon the plaintiff. These ques-

tions are not affected by the fact that in connection with, and as a part of the tort, a release of liability was also obtained. If the acts by which the policy was obtained were tortious, the obtaining of the release at the same time and in the same manner was equally tortious. The complaint of the plaintiff is that he has been tortiously deprived of a thing of value. The defendant replies we have a release. The plaintiff then, in effect, says, that does not make my policy valueless, for the evidence shows that the release also was obtained by the same tortious act.

After full consideration of the record in this cause, we are of the opinion that the evidence presented was amply sufficient to justify submitting it to the jury, and, therefore, we think that the court erred in directing a verdict for the appellee, and for the error so committed the judgment ought to be reversed.

*Reversed and remanded.*